Good morning, Illinois Appellate Court, 1st District Court is now in session. The 3rd Division, the Honorable Justice Nathaniel House presiding. Case number 1-7-1885, People v. Anthony Johnson. Good morning, ladies and gentlemen. This case is being heard via Zoom due to the COVID crisis. My name is Nathaniel House. I'm a judge of the Appellate Court and presiding over this case with me are Justices Margaret McBride and Eileen O'Neill Burke. We're going to proceed as follows this morning. We're going to allow each side to have 10 minutes of uninterrupted presentation. And after each side makes their presentation, the judge will ask questions. The appellant will be allowed to reserve some time for rebuttal. Who are the parties? The parties who are going to make a presentation today, please state their name and the party you represent, beginning with the appellant. Good morning, Your Honors. My name is Brian Reyna with the Office of the State Appellate Defender representing the appellant. I apologize for the delay. I just want you to know I have been in the waiting room since 10. So I don't know what the problem was, but I was here and I'm sorry, I apologize for the inconvenience.  We are aware of the situation. Good morning, Your Honors. I'm Assistant State's Attorney Stacey Weber on behalf of the people. Great. Thank you. Do either one of you have any questions about how we're going to proceed this morning? No, Your Honor. All right. Well, very well then. Mr. Reyna, you may begin when you're ready. May it please the court, counsel, Your Honors. This is a case where the evidence was insufficient to prove that Anthony Johnson, a lifelong Chicago resident and college graduate with no prior criminal history, accountable beyond a reasonable doubt for two murders committed by Tyjuan Mason. At trial, the largely uncontested evidence showed that Johnson was a freelance taxi cab driver who gave Mason a ride and that during the ride, Mason ordered Johnson to stop, pulled out a gun and shot William Junius and Lamont Maddox through the driver's side window. And afterwards, Johnson drove himself and Mason away from the scene. The state presented no direct evidence, such as a statement from Johnson indicating he knew Mason was armed or that he intended to commit a crime. In finding Johnson guilty, the trial court recognized that the state's case rested primarily on the testimony of Alex Ware, who purported to see Johnson point a gun at him through the passenger side window as the car left the scene. Ware's after-the-fact testimony conflicted with all the other evidence, the theories of both parties, and was too unreliable to sustain Johnson's conviction. The undisputed evidence showed that two people were in the car. Johnson was the driver and Mason was the front passenger, but Ware only saw one person, Johnson. For whatever reason, Ware was unable to see Mason in the passenger seat and attributed the gun he saw coming out of the passenger window to the only person he saw in the car, Johnson. Ware also saw smoke coming out of the driver's side window during the shooting and was thus predisposed to believe the driver had a gun. But since we know Mason was the passenger and the shooter, Mason was almost certainly the person sticking the gun out of the passenger side window. This version of events is consistent with the testimony of Virgil Johnson Jr., the only other occurrence witness, who saw the front passenger with a gun, but did not see the driver with a gun. Mr. Ware's testimony was also inconsistent and impeached, which further undermines its relevance to the outcome. Mr. Ware told 911 operator and the detective on the day of the offense that the car did not stop in front of him. It drove right past him to the stop sign at Damon and Ashland. Later at trial, he testified that the car stopped, but Ware's inconsistent statements undermine his reliability. And actually, there's a quote by Ware at trial that I think is relevant here. It actually asked if he told the detective about the car traveling at a high rate of speed as opposed to driving slowly toward him and stopping. And he said, let me put it to you like this. This happened four years ago. What I seen at that particular time, that's what I told them. Some things I might remember clearly. I might not remember all of it clearly, but I thought that it came down 54th Street. So here Mr. Ware is admitting what he told police on the day of the incident was what happened. And what he told police was that the car drove right past him and stopped at the stop sign. Ware's testimony alone was insufficient to sustain Johnson's conviction. State will argue that Ware's testimony is corroborated by other evidence. However, the other evidence presented in this case merely corroborated what both parties had already recognized, which is that Johnson communicated with Mason prior to the shooting and drove him to and from the scene. In an attempt to prove common criminal design, the state wanted to show there was a close relationship between Johnson and Mason. The problem with the state's argument primarily is that even if there were a close relationship, that would not necessarily evidence accountability, particularly in this case where there was no evidentiary link between Johnson's alleged relationship with Mason and his alleged knowledge of Mason's intent. Second problem is that the state was unable to establish a close relationship. State presented phone call records that showed communications between Johnson and Mason. However, these calls were all short, mostly made from Mason to Johnson, which was consistent with Johnson's theory of the case, which was that, and testimony, which is that Mason was calling him to schedule a ride. The state also presented evidence showing Johnson had Mason's picture in his phone. However, this shed little light on Johnson's alleged knowledge of this offense, as everybody Johnson's actually familiar with, his friends and family, he didn't need pictures to remind them of who they were. In an effort to prove shared intent, the state argued that the car was stopped at a specific angle that was somehow helpful to facilitating the shooting. However, the only evidence that this angle was particularly beneficial to the state was the fact that Mason actually did hit the targets he was looking for. However, the angle Johnson stopped the car required a difficult shot. It required Mason to reach through the passenger's, excuse me, over the middle console and shoot out the driver's side window. If Johnson were trying to arrange a good shot for Mason, he would have gone west on 54th Street and put Mason on the same side as the targets he was aiming at. So there's nothing particular about the stop that shows Johnson's knowledge, and Johnson merely stopped the car because Mason told him to, which is insufficient to prove accountability. The rest of the evidence of shared intent focused on Johnson's actions after the shooting, which are insufficient to prove accountability. The fact that Johnson did not go to police is explainable. Mr. Johnson was terrified of Mr. Mason and didn't know what to do at that point. That's something that was addressed in the Ramos case, where the witness or the defendant also didn't go to the police immediately after. And this court held that that is not sufficient evidence of accountability. And the state also speculates that Johnson removed shell casings from his car. However, there's no evidence of that. It's equally as likely that Ware grabbed the shell casings before he left the car. The police did search Mr. Johnson's residence and didn't find any shell casings there. So because Mr. Johnson's conviction rests entirely on Ware's unreliable testimony, we're asking you to reverse both of Mr. Johnson's murder convictions. Additionally, we raise an argument that Mr. Johnson's sentence is unconstitutional as applied to him in violation of the Illinois Proportionate Penalties Clause. The judge was required here to impose two natural life sentences without any consideration of Johnson's independent culpability. Two minutes. I'm sorry, Your Honor. Two minutes. Thank you very much. Thank you. His lack of criminal history and his rehabilitative potential. Given Mr. Johnson's extremely tenuous role in this offense, if any, in two natural life sentences is a shock to the conscience and unconstitutionally disproportionate. And for that reason, we would alternatively ask that you vacate Mr. Johnson's sentences and remand for a new sentence. Thank you. Justice Burke, do you have any questions? I do. Thank you. Good morning, Mr. Reyna. How are you today? Good morning, Justice Burke. I'm doing very well. Thank you. Was that a nightmare not being able to get in? It was stressful. Okay, so I just have a couple questions. So basically, you're asking us to make a determination that the trial court erred in their credibility assessment of the witness, Ware. Is that correct? Ultimately, I mean, the thing about Ware's testimony is we know it's wrong. There are two people in the car and he saw one person. So there's something flawed in his testimony. There are parts of his testimony that also corroborate the defense. So I think in finding Ware credible, I think that the error the court made is believing his testimony 100% as if it was given in a vacuum without other evidence, argument, and theories of the case. Do we know if Mr. Ware stated at what point Mr. Ware stated that he had the gun pointed at him, were there any indications that he had ever told the police that prior to Mr. Johnson being charged? Oh, prior to Mr. Johnson being charged? No, I believe the first time he mentioned that was at the grand jury testimony. Okay. He did not tell the 911 operator when he called a couple of times right after the incident. And he also did not tell the detective, Detective Velasquez. And there were no charges with regard to Mr. Ware as far as aggravated assault or anything like that. Is that correct? Um, that's correct, Your Honor. The only charges were the first degree murder charges that the state proceeded on. Okay. Thank you. I have nothing else. Thank you. Thank you, Justice McBride. Do you have questions? Yes. Good morning, Mr. Raina. Good morning, Justice McBride. Sorry about that little problem. So I apologize as well. No, we understand. Um, Mr. Raina, the single witness rule, it's kind of the state relies on it. It, uh, what is it? What does it kind of say? A single witness, if credible. Right. It's sufficient to sustain a conviction. Right. And so, um, would you agree though, that generally the credibility determination is something the trial court decides? Oh, of course. I mean, uh, credibility determinations are generally made for the trial fact. However, on appeal, the, um, review in court has a duty to independently examine the evidence and, um, independently determine, you know, whether the trial court made the correct credibility determination. All right. Um, and also, even though there is, well, you have argued that there's no evidence of that the defendant assisted before or during the commission of the offense. And if that is true, uh, he cannot be held accountable. You obviously would agree with that. Absolutely, Your Honor. That's the plain language of the accountability statute before or during the events. However, um, it seems as if the trial judge did consider, uh, this after the fact incident where Mr. Ware says that the defendant pointed a gun at him. Is the court allowed to look at that under the law? If you take it as safe flight, evidence of flight or something. Right. Well, under, um, Johnson, the case cited in the opening and reply briefs, this court has held that, uh, evidence after the fact is not relevant to a determination of accountability. And it's, um, because of what Your Honor just stated, uh, which is that the accountability statute requires before a proof of involvement for during the offense. And also, I mean, if we just look at this practically, it wouldn't make sense to infer Mr. Johnson's involvement based on, um, anything that happened after the offense. If we just take a hypothetical situation where we know, and this is absolutely, I do not believe the evidence showed this at all. But if we know that Mr. Johnson stuck a gun out the window and threatened Mr. Ware, um, that wouldn't relate at all to his knowledge of the crime prior to the driving away from the scene. I mean, at that point, we don't know why he would have been doing that. He could have very well been being threatened by Mr. Mason, or he could have been concerned at that point wanting Mr. Mason to get away so that Mr. Mason didn't turn on him, uh, and shoot him. He had just seen Mason shoot two people in front of him. So, uh, the fact it's not a fact, but if it were that he, uh, pointed a gun at someone, it would be a distinct at that point, um, a distinct crime from the underlying offense. And it's because of the accountability statute. And because there are just other reasons for the, an action that might've taken place at that time, um, that are just as probable as having knowledge of the offense. This got this gun that, uh, the police recovered from Mr. Johnson's home, uh, was they, they said it was inoperable. Is that right? That's correct, Robert. Well, was it, was there any testimony about when something is inoperable that it can't even make a clicking sound? No. Um, that's, that's interesting. Um, I don't, I don't know enough about guns to know if that, if that is true, there wasn't testimony about that. Um, I think something interesting about the guns though, is that, uh, the murder weapon was never recovered. So, um, well, Mr. Ware claims to have seen a black gun. Um, Mr. Mason very well could have been using a black gun. We don't know. Um, Virgil said he saw a silver gun, but we don't know. We, we have nothing to judge the reliability of that testimony against without the actual murder weapon. And I mean, you can only, it could have a black gun with a reflection could look silver. So, um, we don't know the color of the gun. So the fact that it was black, uh, or the one where someone's black doesn't make it more likely to really have been, um, Mr. Johnson's than Mr. Mason's. All right. I don't have any questions, further questions. Thank you. Um, what's the story with these 16 phone calls? Wasn't it alleged that these were calls made between the defendant and the, um, uh, the other perpetrator, uh, uh, a few hours before the murder? Yes, they started the night before. And, um, that was consistent with Mr. Johnson's testimony that, uh, Mason had called him looking for a ride the night before he had, Mr. Johnson had given Mason, um, a couple of rides. So he was, uh, a client of his basically for his taxi driving business. Uh, and the, and the phone records show that it was Mason, um, called Johnson 14 times. And I think Johnson only, um, called twice. So, uh, that is also consistent with somebody calling Johnson for a ride. And then Mr. Johnson, you know, when he has a chance calling, calling that person back, these calls are all very short. Uh, and it's inconceivable that a double murder could be planned during a phone call that last seconds. All right. I have no further questions. Anyone else have anything? If not, uh, Ms. Weber, you can proceed when you're ready. Thank you, Your Honor. Uh, may it please the court. Once again, I'm assistant state's attorney, Stacey Weber. The evidence in this case did prove beyond a reasonable doubt that the defendant was accountable for the murders of both William Junius and Lamont Maddox, um, to prove a defendant guilty of first degree murder under a theory of accountability. The state has to prove either that the defendant shared the criminal intent or that there was a common criminal design. And when considering whether there was a common criminal design, the trier of fact must consider all of the circumstances surrounding the crime or the murder in this case. And that includes the defendant's presence during the commission of the offense. It includes his failure to report, uh, uh, the incident, his flight, and as explicitly considered in Fernandez attempts to conceal evidence of the crime and defendant's actions in this case before, during, and after the murder support his conviction. Before the murders, there were multiple phone calls. This was not one or two phone calls consistent with asking for, or setting up a ride. At least 16 phone calls between eight, uh, or between midnight and 2 PM the day of the murders. In addition, the defendant armed himself before picking up the co-defendant. The evidence in the light most favorable to the people shows the defendant armed himself with a black revolver, not the silver handgun sawn by Virgil Johnson, which was automatic, but a black revolver as described both by Alex Ware and is found by law enforcement officers underneath the defendant's bed. Defendant then drove the co-offender to the crime scene, navigating around this neighborhood, knowing that there were gang conflicts in the neighborhood, especially, uh, on cross and knowing that the co-offender, there were areas that the co-offender could not go. Um, during the murders, the defendant stopped not just in the middle of the street, but in the middle of the intersection at an angle, providing an opportunity for the co-offender to shoot at the victims. Defendants account that, uh, he just immediately stopped because the defendant, he thought the defendant might be getting out or picking up people. Makes no sense. He did not pull off. He did not pull over. He did not park. He just stops suddenly in the middle of the intersection at an angle. This only makes sense if he is allowing the co-offender to have a clear shot at the victims. And the strongest evidence of the defendant's accountability is after the shooting. And it's not just that he fled and not just that he fled with a co-offender, but his attempt to silence a witness. He pointed a black revolver at Ware and pulled the trigger. This is clear evidence that he is sending a message of intimidation to where, whether or not he was charged with it to remain silent. Further, the only reasonable inference from this evidence is that the defendant disposed of the shell casings. The defendant's own witness testified that it was a silver automatic handgun. And the defendant's statement for what it's worth also said that the co-offender had an automatic gun and that he could see the shell casings coming out. Yet, evidence technicians only found one shell casing on the scene. And that makes sense when the co-offender who was sitting inside the car shooting the gun from inside the car that the shell casings would come. The defendant had two hours. The shooting occurred at 445. He was not arrested until 650. He had two hours to dispose of this evidence. And even after his arrest, he was obfuscating with the police officers. He did not tell them he was initially a cab driver. He told them another person had asked him to pick up the defendant. And he told the police officers that he didn't know the co-offender. He didn't know the co-offender's name, even though he had met him before. He had offered him multiple rides. He knew his nickname. He had his phone number. He could describe him. He even had his photo in the phone. And yet, he continued to try to minimize his involvement after his arrest. Defendant's account was simply not credible. Unlike Ware, with the specific finding by the trial court, who was credible and consistent. Ware was a neutral and unbiased witness. He had no connection to any of the parties in this case. And he has remained consistent. Their attempt to impeach him based on brief 9-1-1 calls when Ware was still on scene. And he testified that he was afraid that if people saw him cooperating, he could be killed. He told 9-1-1 he did not want to give his name. He did not want to be involved further. But as soon as he had a chance to talk to law enforcement officers away from the scene of the shooting, he was cooperative. Detective Velasquez arrived within 15 minutes. She got Ware's phone number. And she said that she called him 15 minutes after that. So within about 30 minutes, an hour after the shooting, he has a chance to talk to Detective Velasquez. And Detective Velasquez testified that Ware told her that the driver of the car looked at him, extended his arm and pointed a handgun. So he did immediately tell police officers the defendant pointed a handgun at him. He said the same thing in the lineup at 10 o'clock. He identified the defendant as the person driving the white SUV who pointed a revolver at him. He said the same thing in his video statement to the assistant state's attorney that night. The defendant drove the white truck and pointed the gun at him. And it didn't fire because he thought defendant emptied the clip. And he said the same thing to the grand jury. So he has consistently maintained to law enforcement within a short period of time after the murders that the defendant pointed the gun at him. He consistently and accurately identified the truck, the license plate. He identified the defendant correctly in a lineup as the shooter. And he identified or described a black revolver, which just happened to be the exact same kind of gun that law enforcement found underneath the defendant's bed. The defendant was not a mere chauffeur in this case. He assisted not just in driving in the parking, but threatening the witness, destroying evidence, and attempting to conceal the information that he knew about the co-offender. In cases reviewing the sufficiency of the evidence, all inferences must be made in favor of the state. And here, there was a specific finding by the trial court that where was credible and the defendant was not. This court should not overturn those findings, but should instead affirm defendant's conviction. Moving to sentencing. The statute that applied in this case noted that the court shall sentence the defendant to a term of natural life in prison, provided he is 18 and he is found guilty of murdering more than two people. Courts have repeatedly upheld the constitutionality of the mandatory life sentence for both principal offenders and for accountable offenders. All of the cases that defendant relies on specifically address juvenile or youthful offenders, those who are under 18 or 18, 19 years old. Even in-house, which defendant cites in his reply brief, there was lengthy discussion about brain development in juveniles and young adults. They specifically addressed new statutory requirements codifying the factors for Miller v. Alabama. And they specifically addressed parole review, new legislation that parole review must occur for people who are under 21 convicted of first degree murder. And they specifically note that an individual under 21 years of age should receive consideration for their age and maturity level when receiving a harsh sentence. This defendant is essentially asking to find the mandatory life sentence unconstitutional as applied to accountable co-offenders, which this court has repeatedly declined to do. He cannot show and he does not claim that he is a youthful exception under Miller and its project that is specifically geared towards youthful offenders. And there is no other theory and there's no other case law that supports it as unconstitutional as applied to him because he had no background. He had a certificate in automotive repair and he had a stale three-year-old job history. And as such, this court should reject his constitutional challenge and affirm his sentence. Thank you. Justice Burke, do you have any questions? I do. Good morning, Ms. Weber. How are you today? Good. Thank you, Your Honor. I had a couple of questions on the issue of the phone calls. Do we know if they spoke 16 times or we just know that a call was placed to that number 16 times? Well, we know that there are varying lengths of time and there are certain codes that indicate that a call went to voicemail. So some of the calls did in fact go to voicemail, but there were some where there was no code for voicemail. It shows that they were in fact speaking, although the phone calls were relatively short. Um, okay. Let's move on to Alex Ware. So you would characterize him as the star witness against the defendant in this case, would you not? I mean, he was an eyewitness and his testimony was important. He was the only one that put a gun in the defendant's hand, right? Yes, that is correct. Okay. And in spite of the fact that you just detailed all these times, he said that the defendant pointed the gun at him. He was never charged. Johnson was never charged with any offense against Mr. Ware. Is that correct? That's correct. He was charged, I mean, he was charged with first degree murder. He, you know, he was not charged with witness intimidation or, you know, some kind of misdemeanor aggravated assault. Okay. Um, and after the, um, you're saying that the defendant disposed of the shells, what testimony in the record would show us that? That is a reasonable inference from the testimony and from the evidence in this case. And it's the only, uh, inference from the evidence in this case. Couldn't the lieutenant have grabbed the shells when they eject right into his side of the car? He could have. Yes, he could have. And defendant could have testified to that, but he did not. He testified that the co-offender jumped out at the light and, you know, he denied that he had done that anyone had done any kind of cleanup in the car. Okay. Thank you, Ms. Weber. I have no other questions. Thank you. Uh, Justice McBride, do you have questions? Yes. Ms. Weber, uh, my first question to you is how do we know that um, Mr. Johnson's phone number is the one that you have claimed were made between the defendant and the co-offender? Well, this could have been fleshed out more at trial, but the defendant did identify a screenshot in his phone, uh, that had the co-offender's name, uh, information in it. Is that all you're going to be able to tell us? Because I have searched the record. I've seen the exhibit. His name in the phone is Book, B-O-O-K or B-O-O-Q maybe. Yes. There's never been an exhibit, correct me if I'm wrong, that in any way identifies the cell phone of the co-defendant. No number anywhere. Is that correct? That is correct, Your Honor. All right. So I will note that it, it was argued by defense counsel, uh, at trial, the context and the number of these calls, it was a tacit admission that this phone call did in fact belong to the co-offender. Okay. Well, let's talk about that because the videotape statement of the, of Mr. Johnson, uh, indicates that he recalls one phone call that was made. He never in any way indicated that there were 16 exchanges between these two people at any time. Did he ever say that? No, he did not. And part of your whole case is banked on now what you've admitted is missing from this record. That being that there is no evidence whatsoever that the phone calls were actually between Mr. Johnson and the co-offender. Your Honor, the phone number was never explicitly read into the record. I would submit that the defendant did identify, um, the screenshot from the phone with the co-offender. Yes, but there's no connection of any kind in this record that the number belonging to Mason, which ended in the digits of 0433, was in any way ever established. Isn't that true? Yes, Your Honor, that is true. So the trial judge who heard this evidence was under the very, very mistaken impression that these 16 phone calls somehow showed planning. Isn't that correct? That was part of what the trial court stated in its ruling. And so if we throw out these 16 or so calls, or at least 15, that whole theory that there was a plan for this is gone, isn't it? It is the phone calls are gone. It's not that they necessarily planned this. Again, the theory is a common criminal design. It doesn't matter whether or not this co-offender intended or knew that, or that this defendant knew the co-offender was going to murder him, murder the victims at the time. Everything, all of his behaviors indicate that he was indeed cooperating during and after the commission of this crime. Well, we know that acts that occur after the commission of this murder cannot be considered as part of one's accountability. They have to assist, aid, somehow participate before and during the time of the commission of the offense. You would at least agree with that longstanding rule, wouldn't you? I would agree with that, Your Honor. But I would also note that Fernandez explicitly relied on the concealment of evidence after the fact when finding defendant Fernandez accountable. His pointing the gun at Ware is part of the escape. The murder doesn't end immediately upon the shooting. There's a reason that flight is considered. As he is fighting, he points the gun at the eyewitness on the scene, and then the evidence is strong that he concealed the, or got rid of the guns. And then he attempted to conceal the co-offender's involvement once talking to the police. Well, I don't agree with you. I think the Taylor that this offense did not continue with this traveling car. It ended when those two young people were shot on the street. The murder ended at that point, but that's my opinion. I do believe that the court can consider if flight, and it can consider whether they, that the offender continued with the co-offender and that the fact of perhaps concealing evidence could all be used. But I don't agree with you that this flight from the murder was part of the commission of the offense. Now let's go back to those phone calls. I've examined them. There was a stipulation between the defendant and the state that there were phone calls made and the numbers were identified, but that stipulation, as you've already agreed, that did not in any way connect that phone number to Mason. But in looking at those phone calls, a number of them show that phone calls are being made at the very, within seconds at the same time. Are you aware of that? Yes, your honor. And I do apologize in my brief. I did say that there was a, I'm not sure if I said this, but the, it is clear in the records that there is a relay system. It says that in the record. So it is not 16 phone calls and I apologize. It is eight phone calls. All right. So it is eight. So now we know that there's, you know, uh, this information being given to the trial court that is there were 16 calls and now we're saying, Nope, there were eight. And now we're also in a position of having to agree. You concede that the state never even tied up this phone, not in the evidence that the judge relied on. Is that correct? That is correct. Judge. And even though the defense agreed at the trial, uh, that, you know, he, I think the defense agreed that, um, he had a picture of B O O Q or K in his phone and that his phone number was in the phone, but, but he never agreed and never ever agreed that the number was in any way, you know, affirmatively connected to Mason, right? Not explicitly your honor. Well, I don't know. Implicitly there's never even been any evidence that this number that ended in zero four, four, three, that anyone ever conceded that are stipulated. So, um, now the other thing that you say is that we know he armed himself beforehand. Yes. Is the only evidence of that? What happened after the fact that you have a witness who said he saw him with a gun after? Yes, that, that is the evidence and it is corroborated by the same type of gun found underneath his bed. Okay. Um, now what was the name of the other witness who you called, who said there were two people in the car? Mr. Ware says he only saw one person in the car. Isn't that true? Yes, he did say that. Your theory, uh, was, and has always been that another person actually fired the weapon that killed the two people on the street. Yes, your honor. All right. And this other witness that you called, I believe he also testified that there were two people in the car. Didn't he? You know, uh, Virgil Johnson testified that there. Yes. Mr. Johnson. So, so you have another witness that clearly is disputing your, your, your theory of the case that there were two people in the car and your, your, your star witness doesn't even see the defendant in the car. I'm sorry. The, the co-offender I misspoke. You're right. He did. He says he does not see him. He does not see a second person in the car, the second person could have been sitting back and it makes sense that he was looking at the individual that he saw have a gun in his hand. And there's no dispute. The defendant was in fact, the driver of the car defendant conceded as much. But also the fact is that your evidence was that the driver took a gun and opened the passenger side window. And then he pointed the gun at him from the passenger side, not even the driver's side, right? Yes. The witness, uh, where was on the past and would have been on the passenger side as, uh, the defendant was driving on 54th. But this witness now, now this witness was, was unable to recognize that there was actually another person in that passenger seat at the same time. Yes. All right. Now let's talk about motive. We all know that you don't have to show a motive, but here your argument at trial was that he did this for the money for the cab ride. That part of your motive did this for about 10 bucks. I, I don't know that the, the theory of trial was that we found that it was credible that the defendant was acting as a cab driver and did it for $10. They clearly had a relationship. There were, uh, he was in his phone call as a frequently contacted person. Their defendants, uh, co-defendants DNA was on cups found inside the car. Um, I mean, they clearly knew each other, had a relationship. He'd given him multiple rides. You're right. There is no, um, so the fact that there was a cup in the car that had the, um, Mason's DNA on it, that means they had a relationship. Well, there were multiple cops in the car from which Mason could not be excluded, but it is evidence of a relationship between the two. Okay. The other, the other motive you, that was argued, I shouldn't say you miss Weber, but the other argument that was made was that, uh, this was a gang related shooting as many of the drive-by shootings are. Was that argued? Uh, I, I, I believe that it was argued. It certainly was at least on Mason's part, uh, there was evidence of a gang related shooting that both victims were involved in a gang. Mason was also, there also was testimony from his, um, the victim's families who knew him, who had like a blood relationship with him, that he was involved in a separate gang. So it does seem to indicate either there was a conflict over, uh, some family issues. They did have a child in common or it was gang related because they were in conflicting gangs. But I'm talking about Mr. Johnson. Now he's the subject of this appeal. There's no evidence that your honor, sorry. Oh, go ahead. There's no evidence. Were you involved? Okay. So then really it seems like there's no explicable reason for a 31 year old man. Who's never been arrested, never been convicted, graduated from high school, went to a technical college that he somehow would suddenly attach himself to a horrendous plot to kill two young people. Does that make any sense? I cannot read the offender's mind. We only know what he tells people, you know, his motive, the reasons that he did it exist in his mind. Only, only he and Mason could be able to testify as to why this occurred. What we do have is his pointing a gun at the eyewitness. It is clearly a different gun than it is described by both Virgil Johnson and the defendant himself. All right. The one witness rule does depend on the credibility of that witness, doesn't it? Yes, your honor. It does. All right. Are you familiar with any, uh, drive-by shooting cases where you've got the passenger shooting out of the driver's side? Are you, were there any cases like that, that you cited where the passenger's the shooter, but he's reaching over the driver and he's shooting from the driver's window? No, not specifically that I came across that fact pattern, your honor. But again, they're not, there's no testimony that he was circling the block and trying to line up this was driving in this area. He sees these co, you know, these people on the corner and he stops at an angle. No, he doesn't make a U-turn. He doesn't turn around and give him a shot from the driver's window, but he does park where he can more, uh, easily, you know, reach out. It's not that they scoped out this location ahead of time. Mr. Johnson never admitted, uh, that he was aware that the, the co-offender had a gun. No, he did not. And when he spoke with the police, um, for, I don't know, it was about 16 minutes on the videotape. Um, he never admitted that he, he knew that the offender co-offender was going to shoot these people. Did he? No, he did. He initially told police that he didn't know the co-offender at all. Right. Well, that's right. And you know what? That was something he admitted. And in fact, all of the inaccuracies in his statement were conceded when he testified in front of the judge at his bench trial, weren't they? No, not all of his inaccuracies. They did play 19 clips and rebuttal to impeach his testimony. All right. And, and one of those, give me one or two that you think was a significant impeachment. Okay. All right. He was impeached as to whether or not he knew what gangs were around the area. He did in fact tell the police that he, uh, that it was gangster disciples and, um, he believed stones were around the area. I think that is significant impeachment. Um, he was impeached just with the time he said he was home. I mean, just with his testimony alone, he was impeached that he was home for 20 minutes between the shooting and being arrested by the police. We know that was two hours, um, difference. He, um, testified or he testified that he did not say that the co-offender likes to drink, um, sip on liquor and smoke a blunt. He did say that. I mean, he was tested. Didn't he pretty much say, if I said that, if I said something, for example, the thing about the liquor store that he, he actually, uh, was hailed by Mason at the ENJ, right? That's how they ended up. No, your honor. That's what he initially told police that he was hailed at the ENJ. He then later when the police told him during the interview that they were going to get surveillance video from the ENJ, he admitted that no, was several houses down. Okay. And you're saying that that that's a big piece of impeachment. I first said it was nearly, it was at the ENJ. And then he later says, no, it was a couple of houses down that that is some kind of critical indicator that this guy was lying. Is that right? It's an indication that he's attempting to conceal how well he knew the co-offender. He said he didn't know where that his girlfriend lived. That was in fact, not sure. That he did know where the co-offender's girlfriend lived. He was attempting to distance himself, uh, from the co-offender. Well, I think that's, you know, explainable by the fact that he was being charged with murder that he for all intents purposes said from the very get-go had nothing to do with it. The 31 year old man, no gang affiliation, no convictions, uh, several people from the neighborhood testified that he was basically a cab driver for all of them. Wasn't that testimony in the record? Yes, your honor. It was. All right. I don't have any further questions at this time. Thank you, your honor. Thank you. Thank you. My colleagues have adequately covered this. I don't have any questions. Thank you. Thank you, Mr. Rainer. You may take a couple of minutes for rebuttal. Thank you, your honors. I'm going to be very brief. The state just conceded the strongest evidence of accountability was evidence of what occurred after the offense. And as your honors have pointed out, that is insufficient under Illinois law to establish accountability. As far as the evidence of before and during, I don't really feel the need to go through some of the additional things the state brought up as to Mr. Johnson arming himself with a gun. There's just no evidence of any of this. The concealment of things, it's all speculation. And I think that fits into the state's concession that there really isn't a lot of evidence of before or during participation and that the evidence all comes from after. And as far as Johnson's testimony, this isn't a case that came down to a credibility contest between Johnson and Mr. Ware. So there were some pretty insignificant impeachments of Mr. Johnson. But nonetheless, the court didn't have to. If the court found Mr. Johnson incredible, it does not prove the state's case. The state has a burden to prove the offense beyond a reasonable doubt. And the evidence it introduced here was plainly insufficient to do that. And as your honor pointed out, a lot of these impeachments of Johnson were not particularly notable. And many of them were not real inconsistencies either. For instance, the state at some point was arguing that Mr. Johnson knew of Mason's gang affiliation. And what he actually told the detectives was, I don't know, probably because he lives in the area he lives and there are a lot of gang members, but he doesn't know is what he told the police. It's what he said at trial. So those ultimately I think are insignificant as well. As your honor pointed out, there's absolutely no motive. The state's theory doesn't make a lot of sense. And finally, I mean, the state said there's nobody who knows Mr. Johnson's motives or intent other than him and Mason. But it's the state's burden to prove that. I mean, it's the state's burden to prove that. And this is not provable. It's provable through circumstantial evidence. It's proven in mental state. It's proven in many other cases through circumstantial evidence. The problem here is there is no circumstantial evidence of actual planning or participation in this offense. So in some, the evidence was insufficient to sustain this conviction. All right. Thank you. Does anyone have anything else based on what we just heard? Very well. This matter will be taken under advisement. The case is well argued, well briefed. We enjoyed the participation today. We understand that there's a little delay, but we understand counsel. No problem. And we will issue a decision in due course. Have a great day. Thank you so much.